**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,
          Plaintiff,

          v.

SOFONZIA MACK,
          Defendant.

REPORT AND
RECOMMENDATION
17-cr-6159-EAW-JWF

### Preliminary Statement

By a four-count Indictment returned on November 9, 2017, defendant Sofonzia Mack ("Mack" or "the defendant") was charged with federal firearm and drug offenses.[1] See Indictment (Docket # 19). On January 5, 2018, the defendant filed omnibus motions, which included motions to suppress evidence and statements. See Docket # 24. The Court heard oral argument on January 23, 2018 and decided or resolved most of the issues raised by the motions.[2] Docket ## 26, 27. The Court reserved decision on Mack's motions to suppress evidence and statements pending a suppression hearing. See id. An evidentiary hearing on the suppression motions was

---

[1] The Indictment charges Mack with Possession of Marijuana with Intent to Distribute (Count 1); Possession of Firearm in Furtherance of Drug Trafficking Crime (Count 2); Felon in Possession of Firearm and Ammunition (Count 3); and Possession of a Firearm with Removed, Altered and Obliterated Serial Number (Count 4). Docket # 19.

[2] By Order of Hon. Elizabeth A. Wolford, United States District Judge, dated November 9, 2017, all pretrial matters in this case have been referred to the Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). See Docket # 20.

1

held on April 3, 2018 and continued on May 2, 2018.  <u>See</u> Docket ##
29, 30.  The following is my Report and Recommendation as to the
defendant's motions to suppress evidence and statements.

<h2 style="text-align:center"><u>Findings of Fact</u></h2>

Mack's suppression motions concern the events of March 28,
2017 when he was arrested by members of the Rochester Police
Department ("RPD").  His arrest resulted from a traffic stop and
search of a Kia Sedona minivan ("the minivan") by RPD officers
Samuel Giancursio and Eric Melendez.  <u>See</u> Hearing Transcript
(Docket # 31) ("Tr. 1") at 7.  Mack was the only passenger in the
minivan which was being driven by Amina Newsome, the mother of one
of Mack's children.  <u>See</u> Hearing Transcript (Docket # 32) ("Tr.
2") at 145.  Both the government and Mack presented proof at the
suppression hearing.

<u>Government Proof:</u>  The government called Officers Giancursio
and Melendez to testify.  Officer Giancursio testified that on
March 28, 2017, he and Officer Melendez were on patrol in the area
of Exchange Street on the southwest side of the City of Rochester.
Tr. 1 at 7, 26.  The officers observed a black male stepping out
of a house on Exchange Street.  Hearing Transcript (Docket # 33)
("Tr. 2") at 107.  Melendez testified that he thought he remembered
Giancursio remark that he recognized the male.  Tr. 2 at 108.  The
male got into the minivan, which backed out of the driveway on
Exchange Street, turned left on Violetta Street and drove toward

2

Stanley Street. Tr. 1 at 9-10; Tr. 2 at 108. According to Officer Giancursio, the minivan then turned left onto Stanley Street without using a turn signal. Tr. 1 at 10. After making the turn, the minivan began traveling at a high rate of speed. Tr. 1 at 10. The minivan turned left onto Fenwick Street, heading back in the direction it had originally driven after pulling out of the driveway. See Tr. 1 at 10. According to Officer Giancursio, the minivan failed to signal at least one hundred feet prior to making the turn in violation of New York State Vehicle and Traffic Law.[3] Id. The minivan then turned left onto Exchange Street, again failing to signal a sufficient distance before making the turn. Tr. 1 at 12-13. Officer Giancursio activated the overhead lights on his marked police car to initiate a traffic stop. Tr. 1 at 13-14. The minivan pulled to the side of the road on Exchange Street, stopping midway between Fenwick Street and Violetta Street. Tr. 1 at 13.

The officers exited their police vehicle and approached the minivan. Tr. 1 at 14. Giancursio walked to the driver side of the minivan and Melendez approached the passenger side. Tr. 1 at 14-15. According to Giancursio, the driver side window was open. Tr. 1 at 21. As he approached the driver side of the minivan, Giancursio testified that he could make out a "faint smell" of

---

[3] See N.Y. Veh. & Traf. Law § 1163(b).

3

marijuana.  Tr. 1 at 19.  When he was standing next to the driver side door, "face to face with [Newsome], [he] could smell it distinctly coming from inside the [minivan]."  Id.  He testified that based on his experience and training, it smelled like freshly burnt marijuana.  Tr. 1 at 20-21, 55.  According to Giancursio, Newsome appeared "anxious and irate."  Tr. 1 at 15.  He later described her as being "flustered," but stated that he did not fear for his safety when approaching the minivan.  Tr. 1 at 54.

Mack was seated in the passenger side of the minivan and Giancursio stated that Mack likewise appeared to be nervous.  Tr. 1 at 17.  Melendez, however, testified that at this point in the interaction, Mack "seemed normal." Tr. 2 at 110.  Giancursio asked Mack to roll down his window and give his identification to Melendez.  Id.  Mack rolled down his window and told Melendez that he did not have any identification.  Id.  Melendez asked Mack for his pedigree information and Mack responded to his request.  Tr. 2 at 149.  Melendez testified that even after Mack's window was rolled down, he did not smell marijuana.  Tr. 2 at 111.

Giancursio took Newsome's driver's license and he and Melendez returned to their police car.  Tr. 1 at 22.  Giancursio told Melendez that he smelled marijuana but Melendez replied that he had not.  Tr. 2 at 121.  After running Newsome's identification and Mack's pedigree information through the mobile data center in their vehicle, the officers again approached the minivan.  Tr. 1

4

at 23; Tr. 2 at 56-57, 121-22.  As before, Giancursio went to the driver side and Melendez approached the passenger side.  Tr. 1 at 23; Tr. 2 at 109.  Giancursio told Newsome that he smelled marijuana, to which Newsome responded, "probably so."  Tr. 1 at 23, 58.  Melendez testified that this time he smelled marijuana, "[p]robably because the window was down at [sic] a longer time."  Tr. 2 at 111.  However, he could not recall exactly when he first smelled marijuana.  Tr. 2 at 122.

The officers decided to search the minivan because they smelled marijuana.  Tr. 1 at 24.  Giancursio directed Newsome to exit the minivan, move to the back, and stand on the curb, which she did.  Tr. 1 at 25.  Melendez also ordered Mack to step out of the minivan.  Tr. 1 at 25-26.  As Mack was exiting the minivan, Melendez asked him if he had anything in his pockets, but Mack did not reply.  See VIDEO at 16:55:32-34.  When Mack had fully exited the minivan, he put his hands in the air.  Tr. 1 at 26.  Melendez told him to turn around and put his hands behind his back.  Id. Melendez then asked, "any weed? I don't care, you can just tell me."  Id. at 16:55:34-37.  Mack replied that he had marijuana in a bag located in the minivan.  Id. at 16:55:37-39.  According to Melendez, at this point the officers had already planned to place Mack in their police vehicle and Melendez was going to frisk Mack to make sure he was not carrying any weapons, which, according to

Melendez, was standard procedure for officer safety.   Tr. 2 at 112-13, 136.

While Mack was standing facing the passenger side door of the minivan with his back to Melendez, Melendez positioned Mack's hands behind his back so that he could begin to frisk him.   Tr. 2 at 113, 125-26.   Melendez said he glanced at Mack's right jacket pocket, which was "slightly open," and saw "what appeared to be" the handle of a handgun.   Tr. 2 at 113-14, 126.   He testified that he did not touch the outside of the pocket prior to seeing the weapon, but that after he saw it he opened the pocket at the same time as he "was going to grab the handgun" with his right hand. Tr. 2 at 114-15, 140-41.   According to Melendez, this all occurred in "a split second."   Tr. 2 at 113.   Melendez said it "was a pretty deep pocket."   Tr. 2 at 127.   The video footage taken on Melendez's body camera shows Melendez use his right hand to further open Mack's right jacket pocket by tugging on the side of the pocket *before* putting his hand inside.   See VIDEO 16:55:39-43.   From the angle of the body camera, however, it is impossible to view the scene from Melendez's exact viewpoint because the video camera was strapped to Melendez's chest.   After inserting his hand in the pocket, Melendez pulled out the handgun[4] and "threw it to the ground next to [him]."   Tr. 2 at 114-15.   He exclaimed "dude,

---

[4] Photographs of the handgun were received in evidence.   Gov't Ex. 3, 4, 5.   It is a small, black pistol with white overlay on the sides of the handle.   See Gov't Ex. 3.

dude," and Giancursio rushed over and assisted in handcuffing the defendant. Tr. 1 at 26, 80; VIDEO 16:55:43-51. After Mack was handcuffed, Melendez performed a more thorough search. Tr. 2 at 128. Melendez retrieved cash and a pack of cigarettes from Mack's right jacket pocket, where he had found the handgun. See Tr. 2 at 129.

Mack did not resist the officers' commands at any time during this interaction. Tr. 2 at 123 and VIDEO 16:55:39-56:06. In fact, Melendez testified that Mack was "completely compliant" and did not make any threatening gestures or remarks. Tr. 2 at 112, 123, 134. Melendez testified that during his interaction with the defendant, he did not fear for his life, did not think Mack was dangerous and he did not suspect that Mack had a firearm. Tr. 2 at 124. Likewise, Giancursio testified that Mack "was very cooperative and polite," "very respectful" and did not make any attempts to run from the officers. Tr. 1 at 66, 67, 88.

After placing Mack in the backseat of the police vehicle, Melendez searched the minivan. Tr. 2 at 116-17. The search produced multiple vials of marijuana in a tan colored bag on the floor of the passenger side of the minivan and cash in the center console. Tr. 2 at 117-18. Giancursio did not participate in the search. Tr. 1 at 35. Melendez did not recover any evidence of burned marijuana. Tr. 1 at 57-58; Tr. 2 at 123.

At some point, several other RPD officers, including a supervisor, arrived on the scene. See Tr. 2 at 83. The officers decided to take Mack downtown to the Public Safety Building (PSB). Tr. 1 at 36; Tr. 2 at 82-83. They also decided to require Ms. Newsome to come to the PSB, but they allowed her to drive separately in the minivan. Tr. 2 at 83. Before departing the scene, Giancursio remarked to the other officers and his supervisor, "I think if she's there, he'll definitely take the rap." See VIDEO 17:07:27-30; Tr. 2 at 84, 85. Referring to Newsome, Giancursio said, "I think we'll take her up there and then let her go." Tr. 2 at 86. On cross-examination, Giancursio stated that he "said something along those lines, yes." Tr. 2 at 84. He qualified this by explaining, "I'm assuming that I was thinking to keep everybody together because she's the owner of the vehicle, taking everybody up and then sorting it out there and finalizing what's going to actually transpire at that point." Tr. 2 at 86.

Officers Giancursio and Melendez drove Mack in their police vehicle to the PSB. Tr. 2 at 90. When they arrived, Mack was placed in an interview room. Tr. 2 at 91. Giancursio turned off his body camera upon entering the PSB, and the camera was not turned on at all during the interview. Tr. 1 at 36. According to Giancursio, he was told that body cameras should be turned off because of the elevators in the building. See Tr. 2 at 98-99.

Officer Melendez, however, stated that he was not aware of any policy requiring that body cameras be turned off while in the Public Safety Building.  Tr. 2 at 134.

At 5:34 p.m. the interview of Mack commenced.  Giancursio read Mack his <u>Miranda</u> rights using a "Miranda card."  Tr. 1 at 41; Tr. 2 at 91; <u>see</u> Gov't Ex. 10.  Mack had not been read his rights at any time prior to this.  <u>See</u> Tr. 2 at 132.  After Giancursio read him his rights, Mack stated that he understood his rights and that he agreed to talk to Giancursio.  Tr. 1 at 42-43; Tr. 2 at 92; <u>see</u> Gov't Ex. 10.  Mack indicated that he had not graduated from high school but did have a GED.  Tr. 1 at 40.  He said that he had smoked marijuana earlier that same day at about 11 a.m. <u>Id.</u>  According to Officer Giancursio, Mack did not appear to be sick or under the influence of any drugs or alcohol during the interview.  Tr. 1 at 41.  Officer Giancursio interviewed and then created a written statement for Mack to review.  Tr. 1 at 45-46. Giancursio described the statement as follows: "It was [Mack] basically telling me what he wanted to say and me just jotting it down what he was saying verbatim."  Tr. 1 at 46.  In the statement, Mack admitted that he had purchased the gun and that it was his. <u>See</u> Gov't Ex. 11.  He said that Ms. Newsome did not know he had the gun.  <u>See id.</u>  Other than noting that the police officers said they smelled weed, the statement does not mention marijuana.  <u>See</u> <u>id.</u>

Mack signed the bottom of the statement and initialed changes that he made after Giancursio finished writing.  Tr. 1 at 47-48; Tr. 2 at 94; see Gov't Ex. 11.  Before he signed the statement, however, according to Giancursio, Mack said, "I might have to speak with a lawyer but if I don't sign this, then nobody's going to be able to hear my side of this."  Tr. 1 at 48.  On cross-examination, Giancursio stated that Mack "said something along the lines of, 'I don't know if I should sign this or not. I might need an attorney. But if I don't sign this, then the judge and everybody else won't hear my side of the story.'"  Tr. 2 at 95.  Giancursio stated that he told him he could have a lawyer, but Mack signed the statement anyway.  Id.  According to Giancursio, the interview lasted approximately 20 to 25 minutes.  Tr. 2 at 49-50.

Melendez was not present during the interview, nor was Newsome.  Tr. 2 at 101, 159.  Giancursio did not recall what happened to Newsome after the officers commenced the interview. Tr. 2 at 101.  Melendez stated that Newsome may have been outside of the interview room, but he could not remember.  Tr. 2 at 133. He said that he believed she was sent a traffic ticket that same day.  Tr. 2 at 135.

Defense Proof:  The defendant testified at the suppression hearing.  Mack stated that he had smoked marijuana earlier that day at about 10:30 a.m. or 11:00 a.m., but that he had not smoked any marijuana while he was in the minivan.  Tr. 2 at 146.  The

traffic stop occurred around 5:00 p.m. Id. In fact, Mack testified that he had changed his clothes between when he smoked marijuana and when he got into the minivan. Id. Mack later testified that during this period in time, he was smoking marijuana on a daily basis. Tr. 2 at 176-77.

Mack testified that he was not nervous when the minivan was stopped and that he was compliant with all of the officers' directions. Tr. 2 at 148. He testified that the zipper on his right jacket pocket was "kind of up a little bit . . . ." Tr. 2 at 150. He said that the gun was in the right pocket but that it was not protruding out of the pocket. Tr. 2 at 151. Mack said Melendez reached into the right jacket pocket without first patting him down. Id. The jacket was received in evidence and Mack demonstrated the depth of the right pocket by inserting his hand into the pocket. Tr. 2 at 151-52. The pocket covered his entire hand. Tr. 2 at 152. He also testified that he had recently smoked a cigarette and had put the pack of cigarettes in the top of the pocket, on top of the gun, which had sunk to the bottom of the pocket because of its weight. Id.

After the officers found the handgun, Mack was handcuffed and placed in the officers' police vehicle. Tr. 2 at 156. He watched as the officers searched the minivan and then as they let Newsome back in the minivan to drive to the PSB. Tr. 2 at 157. The officers led a handcuffed Mack into the building with Newsome

behind them.  Id.  The officers did not allow Mack and Newsome to speak to each other.  Id.  Mack was placed in an interview room and his handcuffs were removed.  Id.  He asked to speak to Newsome but Giancursio told him that the officers wanted to complete his questioning before he could speak to her.  Tr. 2 at 159.  Mack told Giancursio that he was a "mental health patient" but that he was not currently taking medications.  Tr. 2 at 160-61.

Mack said his questioning lasted an hour and a half or maybe even two hours.  Tr. 2 at 163.  According to Mack, Giancursio threatened him by telling him that if he didn't sign the statement, the police would incarcerate Newsome, that his child would end up in foster care, that Newsome would lose her car and not be able to go to work and possibly lose her job.  Tr. 2 at 165.  According to Mack, Giancursio said that he could only see Newsome if he signed the statement.  Tr. 2 at 170.  This threat was made, according to Mack, when he said he did not want to sign the statement that Giancursio had written.  Tr. 2 at 165.  Giancursio let Mack read the statement, but, according to Mack, when he tried to make changes, Giancursio told him that he was not going to let Mack "finger fuck" the paperwork into what Mack wanted it to say.  Tr. 2 at 166.  At that point, Mack said he "went into a more panicked state," started thinking about Newsome's and his child's well-being, and decided to sign the statement.  Tr. 2 at 166-67.

Mack said that when he asked for a lawyer, Giancursio told him that it would take a few days before he got a lawyer and that the police would hold Newsome and him for that period of time. Tr. 2 at 168, 170. Mack said he signed the statement "for her," meaning Newsome, and his daughter. Tr. 2 at 168. According to Mack, he was explicit when asking for a lawyer:

> I remember exactly as he was reading, I was like, I think I might need a lawyer and I was like, yeah, I need a lawyer. And that's him pressing me with the issue of my baby mother and everything, it just, it just caused me to panic and just to say forget it, here. But I did ask for a lawyer.

Id. On cross-examination, Mack stated that he asked for a lawyer after the statement had been reduced to writing and he had signed the first page, but before he signed the second page. Tr. 2 at 198-99. At the end of the interview, Mack said they let Newsome in the interview room. Tr. 2 at 170-71. He apologized to her and said he signed the statement. Tr. 2 at 171. The officers then let Newsome go and brought Mack to jail. Tr. 2 at 171.

### Discussion

To determine the legality of the post-stop conduct of the police, each step of the encounter between Mack and the police must be evaluated under Fourth Amendment principles.

Stop of the Minivan: An automobile stop must be reasonable under the circumstances to satisfy the Fourth Amendment. Whren v. United States, 517 U.S. 806, 810 (1996). For an automobile stop

to be reasonable, the officer making the stop must "have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005). "When an officer observes a traffic offense - however minor - he has probable cause to stop the driver of the vehicle." United States v. Scopo, 19 F.3d 777, 782 (2d Cir. 1994) (quotations and citations omitted). Here, defendant concedes that after witnessing the driver of the minivan "fail to signal properly at two intersections", Officers Giancursio and Melendez had "a valid reason" to stop the vehicle. See Defendant's Post-Hearing Memorandum of Law (Docket #41) at page 3. Accordingly, I find that the stop of the minivan was supported by probable cause. See United States v. Fernandez-Jimenez, No. 03 CR.1493(RPP), 2004 WL 1598653, at *3 (S.D.N.Y. July 16, 2004) (officers' observation that vehicle turned without using turn signal justified traffic stop).

Seizure and Subsequent Search of the Defendant: Mack argues that while the police may have had probable cause to stop the minivan for an observed traffic violation, the traffic infraction "was not a permissible reason to subsequently search the minivan or its passengers." See Defendant's Post-Hearing Memorandum of Law at page 3.

14

In Pennsylvania v. Mimms, 434 U.S. 106 (1977) the Supreme Court held that a police officer may routinely order the driver of a lawfully stopped car to exit the vehicle.  Twenty years later, in Maryland v. Wilson, the Court extended the rule of Mimms to passengers, holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."  Maryland v. Wilson, 519 U.S. 408, 415 (1997).  Thus, it was lawful for Officer Melendez to direct Mack to step out of the vehicle.

However, once Mack exited the vehicle, the encounter became more complicated.  Melendez testified that he and Giancursio had decided to order Mack to exit the vehicle, conduct a pat-frisk of Mack for weapons, and then place the defendant in the back of their police vehicle while the van was searched.  Tr. 2 at 112-14. Although the Supreme Court in Wilson authorized law enforcement to require a passenger to exit a vehicle during a traffic stop, the Court specifically declined to decide whether "an officer may forcibly detain a passenger for the entire duration of the stop." Wilson, 519 U.S. at 415 n.3.  Here, before forcibly detaining Mack in the back of the patrol car, Officer Melendez conducted a pat frisk of Mack for weapons.  According to Melendez, [b]ecause he was going to sit in the back of our patrol car[,] [i]t's our procedure to pat frisk for weapons for our safety."  Tr. 2 at 113. Unlike ordering a passenger in a traffic stop to exit a vehicle,

an officer conducting a routine traffic stop may not pat frisk a passenger for weapons as a matter of course. In Arizona v. Johnson a unanimous Supreme Court held that to justify a "patdown" of a passenger during a traffic stop, "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." Arizona v. Johnson, 555 U.S. 323, 327 (2009). Thus, the fact that Melendez was following "procedure" by subjecting Mack to a "patdown" frisk before placing him in the back of a patrol car does not comport with Johnson. Unless the officers had some "reasonable basis" to suspect Mack was "armed and dangerous", they had no right to search him, even for weapons. "A reasonable basis requires more than a hunch. Rather, it demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014).

Here, the government makes little effort to identify "specific and articulable facts" that gave Officer Melendez a reason to believe that Mack was armed and dangerous. Indeed, the only argument the government makes in this regard is asserting that, "[h]aving lawfully stopped the Sedona in which Mack was the passenger, officers could conduct a limited pat-frisk to ensure he was not armed." See Government's Post Hearing Memorandum of Law at page 18. But "an officer performing a Terry stop may not

automatically frisk the individual subject to the stop; rather, to do so, the officer must have some articulable suspicion that the subject is "armed and dangerous." United States v. Williams, 731 F.3d 678, 686 (7th Cir. 2013). The evidence at the suppression hearing confirms that nothing Mack said or did prior to the pat-search of his person justified any suspicion that he had a weapon or was dangerous. Mack did not object or resist the officers' commands. Officer Melendez described his behavior during the stop as "completely compliant." Mack made no express or implied threats, made no gestures or motions that would cause alarm or suspicion. Melendez testified that during his interaction with Mack, he did not fear for his life, did not think Mack was dangerous and he did not suspect that Mack had a firearm. Similarly, Officer Giancursio described Mack as "very cooperative and polite", and "very respectful." In short, the government has failed to offer any evidence to support a factual finding that the officers had a reasonable suspicion that Mack was armed and dangerous at the time they commenced the pat-frisk. Accordingly, the pat-frisk search of the defendant's person violated Mack's Fourth Amendment right to be free from unreasonable searches and seizures. United States v. McKoy, 428 F.3d 38, 41 (1st Cir. 2005)(despite "the risk of harm faced by police officers at any traffic stop", a pat-frisk not allowed unless justified by reasonable belief that vehicle occupant could be armed and dangerous.); United States v. Brown,

188 F.3d 860, 864 (7th Cir. 1999)(While "the confrontation between a police officer and a citizen stopped for a traffic violation can be fraught with danger", that "fact alone does not justify a pat-down search."); Floyd v. City of New York, 959 F. Supp. 2d 540, 627 (S.D.N.Y. 2013)(nothing about a marijuana use infraction provides reasonable suspicion that suspect was armed and dangerous.).

Inevitable Discovery: In its post-hearing brief the government argues that "[e]ven if the search of Mack immediately after he stepped from the Sedona was not proper, the record supports the finding any evidence seized from Mack himself would have been inevitably discovered." See Government's Post Hearing Memorandum of Law at page 19. Under the "inevitable discovery" doctrine, evidence obtained during the course of an unreasonable search and seizure is nonetheless admissible "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation. United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006), quoting Nix v. Williams, 467 U.S. 431, 447 (1984). "The government bears the burden of proving inevitable discovery by a preponderance of the evidence." United States v. Stokes, 733 F.3d 438, 444 (2d Cir. 2013).

The government has met its burden here. "[W]hen ... officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain

a warrant prior to searching the car for and seizing the contraband." Florida v. White, 526 U.S. 559, 563-64 (1999). Officer Giancursio testified that he detected the odor of marijuana from the minivan upon both of his approaches to the driver's side window. Officer Melendez smelled marijuana upon his second approach of passenger Mack's window. The officers' olfactory senses were corroborated when the driver of the vehicle admitted to Officer Giancursio that indeed "someone" may have been smoking marijuana in the vehicle. Thus, the smell of marijuana gave the officers probable cause to search any area of the Sedona where marijuana could be found. See United States v. Mitchell, No. 11-CR-6019, 2012 WL 6827387, at *7 (W.D.N.Y. Nov. 27, 2012), Report and Recommendation adopted, No. 11-CR-6019L, 2013 WL 132459 (W.D.N.Y. Jan. 9, 2013); United States v. Dixon, 09-CR-6046, 2010 WL 3167381, at *3 (W.D.N.Y. May 26, 2010), Report and Recommendation adopted, 2010 WL 3167380 (W.D.N.Y. Aug. 10, 2010); see also United States v. Martin, No. 09-1832, 2010 WL 145111, at *4 (7th Cir. Jan. 15, 2010) (after officer detected the odor of marijuana emanating from the vehicle, he had probable cause to search the car); United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002)(smell of burning marijuana as officer approached car provided probable cause to search vehicle after stopping vehicle for speeding). See generally Andrea Levinson Ben-Yosef, Validity of Warrantless Search of Motor Vehicle Based on Odor of Marijuana—

Federal Cases, 188 A.L.R. Fed. 487 (2003). For these reasons, Officer Giancursio and Melendez's search of any area of the vehicle where marijuana could be found did not violate the Fourth Amendment. The search of the Sedona resulted in the discovery of a baggie "filled with marijuana" on the front passenger side floorboard. Having found a baggie of marijuana on the floor of the vehicle directly in front of where Mack was just seated, the officers had probable cause to arrest Mack on drug possession charges. A thorough post-arrest search of a person is a reasonable search under the Fourth Amendment. New York v. Belton, 453 U.S. 454, 459 (1981). Therefore, the officers would certainly have searched Mack incident to his arrest on the drug charge and the weapon in his pocket would have been inevitably discovered. See, e.g., United States v. Santillan, 902 F.3d 49, 59 (2d Cir. 2018) (currency illegally seized during pat-frisk for weapons was nonetheless "admissible because it would have been inevitably discovered during a search incident to arrest after the officers discovered cocaine in the car."); United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)("The discovery of the marijuana in the van provided probable cause to arrest Romero and Ortega, and upon arrest the officers unquestionably would have searched Romero and discovered the marijuana in his pocket."); United States v. Lemons, 153 F. Supp. 2d 948, 967 (E.D. Wis. 2001)(where defendant would have been arrested for driving without a valid license, an

illegal search of his person did not require suppression of a weapon found because "[t]he gun would have been found in a search incident . . . arrest.")

In sum, because I find that (1) the police had probable cause to search the Sedona for marijuana and (2) the gun on Mack's person would have been inevitably discovered pursuant to a search incident to Mack's arrest on drug charges, it is my Report and Recommendation that the defendant's motion to suppress the contraband found in the vehicle and the weapon found on his person be **denied**.

Statements Made During the Traffic Stop: Based on the totality of circumstances, I find that at the point the defendant had been ordered from the car and the firearm discovered in Mack's jacket pocket, Mack was in custody for purposes of Miranda. It was at this juncture of the developing encounter that Mack was placed in handcuffs and there was "a restraint on freedom of movement of the degree associated with a formal arrest." United States v. Newton, 369 F.3d 659, 670 (2d Cir. 2004). However, any statements made by Mack prior to this time are not subject to suppression for a violation of Miranda. See Santillan, 902 F.3d at 61 (applying Miranda analysis of custody to the circumstances of a traffic stop that developed into an investigatory stop and then into an arrest).

Mack made several statements after he was in custody. The government argues that these statements (which are described in footnote seven of the government's brief) are admissible because they were spontaneous utterances, and not in response to any formal custodial questioning.

The test for determining whether the conduct of law enforcement agents amounted to "interrogation" is whether the words or actions of law enforcement agents "were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 302 (1980). Thus, the term "interrogation" includes both express questioning or its functional equivalent and includes any "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." Id. at 300-02. In making this assessment, the Court must consider "the totality of the circumstances of the agents' conduct." United States v. Cota, 953 F.2d 753, 758 (2d Cir. 1992). The determination of whether s statement is likely to elicit an incriminating response "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Innis, 446 U.S. at 301. However, "Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." United States v. Hayes, 120 F.3d 739, 744 (8th Cir. 1997) (internal quotations and citations omitted).

I find that the post-arrest statements of Mack set forth in footnote seven were made spontaneously in an effort to free Ms. Newsome and not in response to any questioning or conduct by law enforcement that would be reasonably likely to elicit an incriminating response. While Mack may have felt it necessary to try and clear Ms. Newsome from legal responsibility for the drugs in the car, the choice to try and exonerate Newsome was the defendant's and was not the product of interrogation or its functional equivalent. Accordingly, these spontaneous statements should be admissible.[5]  Innis, 446 U.S. at 300 (volunteered statements are admissible in evidence and are not subject to Miranda safeguards); United States v. Gelzer, 50 F.3d 1133, 1138 (2d Cir. 1995)(statements defendant volunteered while being transported in police car were not the product of interrogation and were admissible); United States v. Figueroa, 300 F. App'x 93, 95 (2d Cir. 2008)(holding that the district court [Larimer, J.] did not err in finding that the statements at issue were not "made in response to express questioning or its functional equivalent" since "[a]ll three statements were made while the officers were

---

[5] As far as the Court can tell, the statements Mack made at the scene of the stop relate to narcotics and currency found in Ms. Newsome's vehicle.  To the extent the government is alleging that the statements refer to the firearm found during the illegal pat-frisk of Mack's person, these statements must be suppressed.  As made clear in Santillan, 902 F.3d at 60-61, even though the gun may be admissible under the inevitable discovery doctrine, the weapon was "still improperly taken" and statements made at the scene of traffic stop regarding the gun are "fruit of the poisonous tree" and therefore inadmissible.  See Wong Sun v. United States, 371 U.S. 471, 488 (1963).

going about their routine tasks in conducting a search, securing a crime scene, and making an arrest"); United States v. Mitchell, No. 11-CR-6019, 2012 WL 4325462, at *2 (W.D.N.Y.) ("While Mitchell may have felt the discovery of drugs and a firearm during the search of the residence deserved an explanation in order to exculpate Ms. Smith from criminal liability, the choice to offer an explanation was his and was not the product of interrogation or its functional equivalent."), adopted by 2012 WL 4324923 (W.D.N.Y. Sept. 20, 2012); United States v. Hemingway, No. 05-CR-6108L, 2007 WL 499470, at *1 (W.D.N.Y. Feb. 13, 2007)(statements made by defendant seeking to exculpate brother after narcotics found in kitchen during execution of search warrant were spontaneous under Innis). Accordingly, it is my Report and Recommendation that defendant's motion to suppress these statements be denied.[6]

Statements made at the Public Safety Building: After Mack was arrested he was transported to an interview room at the Public Safety Building (PSB) for questioning. Mack does not dispute that prior to being interviewed he was fully informed of his Miranda rights by Officer Giancursio. See Defendant's Post-Hearing Memoradum of Law at page 21. Mack argues however that the

---

[6] There is one statement of the defendant, however, that should be suppressed. After Mack had been removed from the vehicle and as he was being searched, Officer Melendez asked Mack if he had any "weed" on him, assuring the defendant that he didn't "care" if he did so long as he told him about it. Mack responded by admitting he had "weed in my bag." This statement, which was made as the defendant was being physically seized by Melendez, was the product of custodial interrogation and should not be used by the government in their case-in-chief.

statements he made were involuntary because of (1) "Giancursio's outrageous and coercive conduct during the interview"; (2) his mental health issues and (3) his request to consult with an attorney. Id.

1. Giancursio's Conduct: Mack claims that the statements he made at the PSB were involuntary "because Newsome and his child were threatened during the course of questioning." Id. at page 18. Mack testified that before making his statement at the PSB he asked if he could see Ms. Newsome and was told no. He also claimed that Giancursio told him that if he "did not sign the paperwork" Ms. Newsome would lose her job because she would be delayed in getting to work and her children would end up in foster care. Tr. 2 at 165. The Court did not find Mack's testimony as to being coerced by Giancursio as believable and thus does not credit his version of Giancursio's conduct. In addition, the suppression hearing testimony confirmed that throughout the encounter Mack repeatedly tried to exonerate Ms. Newsome from any criminal liability. Thus, even if Mack was motivated to give a statement to law enforcement because he thought doing so would cause the release of Ms. Newsome, such conduct does not render his statements involuntary. See United States v. Mullens, 536 F.2d 997, 1000 (2d Cir. 1976)(a confession is not involuntary "solely on the ground that it was prompted by the defendant's desire to protect a relative from the rigors of arrest, interrogation and possible

confinement."); Vega v. Artuz, No. 97 CIV 3775 LTS JCF, 2002 WL 252764, at *11 (S.D.N.Y. Feb. 20, 2002)(no improper coercion to confess where detectives told defendant "that his wife and mother were suspects because they were also in the household with the victim and that if the petitioner had done it, he should save his family further trouble.").

2. Mental Health Issues: Mack claims that the statements he made at the PSB were involuntary because "Mack testified that he was not taking medication for several psychiatric illnesses that he had been prescribed and he was nervous and panicky at the time of the statement." See Defendant's Post-Hearing Memorandum of Law at page 18.

In Colorado v. Connelly, 479 U.S. 157, 167 (1986), the Supreme Court held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . ." "Applying Connelly, courts have repeatedly rejected arguments that a statement made in response to law enforcement interrogation is involuntary solely due to the confessor's diminished mental state, regardless of whether the mental deficit stems from intoxication or from psychological impairments." United States v. Parker, 116 F. Supp. 3d 159, 176 (W.D.N.Y. 2015), adopting Report and Recommendation of Payson, Mag. J. (collecting cases). See also United States v. Salameh, 152 F.3d 88, 117 (2d Cir. 1998)(because [the defendant] does not contend that federal agents either

mentally or physically coerced his remarks during that interrogation, there is no basis for inquiry into a possible constitutional violation); Miller v. Dugger, 838 F.2d 1530, 1537 (11th Cir.) ("Connelly makes clear that even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statements involuntary unless '[t]he police exploited this weakness with coercive tactics'")(quoting Connelly, 479 U.S. at 165, cert. denied, 486 U.S. 1061 (1988)).

Mack's claim that his alleged mental health issues rendered his confession involuntary is not persuasive. First, whether Mack has been diagnosed with, suffers from, or is taking medications for PTSD, ADHD, schizophrenia, bipolar disorder, depression, anxiety and panic disorder was based solely on his own self-diagnosis testimony — no actual medical evidence, mental health records or drug prescriptions were introduced to support or confirm such a wide variety of mental health issues. Moreover, nothing in the video evidence introduced at the hearing suggested that Mack was panicked, manic, depressed, anxious, detached or acting in a way that would suggest severe mental illness.[7] And, as previously noted, this Court did not find Mack's testimony that he was coerced or threatened into making a statement to police shortly after his arrest to be particularly credible. Accordingly, assuming Mack

---

[7] In fact, Mack testified that after he told Officer Giancursio what medications he was taking, Giancursio asked "if anything was wrong and I told him, no, I'm going to be all right." Tr. 1 at 161.

suffers from severe mental illness, I find that police did not employ improper or coercive interrogation strategies that took advantage of any diminished mental state.

    3.  <u>Invocation of Right to Counsel</u>: According to Mack, as Giancursio was going over his written statement with him, Mack told the officer:

> I was like, I think I might need a lawyer and I was like, yeah, I need a lawyer. And that's him pressing me with the issue of my baby mother and everything, it just, it just caused me to panic and just to say forget it, here. But I did ask for a lawyer.

Tr. 2 at 168.  In his testimony, Officer Giancursio recalled the conversation about needing a lawyer as follows:

> [T]o my recollection he said something along the lines of, I don't know if I should sign this or not. I might need an attorney. But if I don't sign this, then the judge and everybody else won't hear my side of the story. And then he went on to sign it.

Tr. 2 at page 95.

"For a suspect to invoke his <u>Miranda</u> right to counsel, he must at a minimum make 'some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation.'" <u>United States v. Oehne</u>, 698 F.3d 119, 122-23 (2d Cir. 2012) (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991)) (emphasis omitted).  "'If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify

whether the accused wants to invoke his or her <u>Miranda</u> rights.'" <u>Id.</u> at 123 (quoting <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 381 (2010)). <u>See also</u> <u>Bush v. Kirkpatrick</u>, No. 06-CV-0771T, 2010 WL 415288, at *4 (W.D.N.Y. Jan. 28, 2010). Instead, "the suspect must unambiguously request counsel." <u>Davis v. United States</u>, 512 U.S. 452, 459, 462 (1994).

Mack insists that he requested to speak to an attorney before signing the statement that Officer Giancursio had drafted. Giancursio concedes that Mack said something about "needing an attorney", but quickly changed his mind, ostensibly because, according to Giancursio, Mack wanted to make sure "the judge" would hear Mack's "side of the story." Giancursio's recollection was not as certain as Mack's and it is difficult to understand why Mack, a convicted felon, would want to make sure "the judge" hears a story in which Mack admits to possessing a firearm. Unfortunately, Giancursio did not record his questioning of Mack. And the government argues that "even if Mack's statements were to be interpreted as an invocation of the right to counsel, all that would apparently be suppressed under this theory would be Mack's signature on page two of the statement." <u>See</u> Government's Reply Brief at page 9 n.1. Based on the totality of the evidence adduced at the hearing, I conclude Mack's testimony that he requested to speak to an attorney before signing the statement Officer Giancusio drafted to be credible. My review of the suppression hearing

indicates that Mack testified he asked for an attorney <u>after</u> the completed statement had been drafted and reviewed with him, but <u>before</u> he had signed either page. <u>See</u> Tr. 2 at 198-200. Accordingly, it is my Report and Recommendation that Mack's signatures on pages one and two of the statement should be suppressed as it was just prior to signing the statement that Mack requested the assistance of counsel.

<u>Additional Briefing</u>:   There is an additional basis for the Court to suppress the statements the defendant made at the PSB that has not been addressed by either party.   The government argued, and the Court agrees, that despite the fact that the seizure of the gun from his person violated Mack's Fourth Amendment rights, the weapon is nevertheless admissible at trial pursuant to the inevitable discovery doctrine. <u>See</u> Government's Brief at pages 9-10.   In <u>Santillan</u>, the Second Circuit made clear that while illegally seized evidence may be admissible at trial as inevitably discovered, such evidence is still wrongfully obtained and statements made by a defendant about that evidence may be considered as the fruit of the poisonous tree. <u>Id</u>. at 59-60. Here, neither the defendant nor the government has addressed whether the statements Mack made at the PSB could be "fruits" of the "poisonous" pat-frisk made during the traffic stop.[8]   Such

---

[8] Neither party has cited <u>Santillian</u> and the defendant's arguments in support of his motion to suppress the PSB statements are limited to <u>Miranda</u> and

briefing is essential to the Court making a ruling on this issue. Accordingly, the parties are directed to file supplemental briefs on this issue <u>within three weeks from entry of this Report and Recommendation</u>. Any objections to this Report and Recommendation shall be delayed until after the Court reviews the supplemental briefing and issues a Supplemental Report and Recommendation.

<u>Conclusion</u>

For the reasons set forth herein, it is my Report and Recommendation that defendant's motion to suppress evidence and statements be **granted in part and denied in part. The parties are directed to file supplemental briefs as directed herein.**

SO ORDERED.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:    November 28, 2018
          Rochester, New York

---

voluntariness arguments.   <u>See</u> Defendant's Post-Hearing Memorandum of Law at pages 18-22.